## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| ANNE PIERO SILAGY, Trustee, )<br><br>PLAINTIFF, )<br><br>vs. )<br><br>ANDY CHARLES MORRIS, )<br><br>DEFENDANT. ) | **CASE NO. 5:13-cv-2645**<br>(Adv. Proc. No. 12-6133)<br>(Bankr. No. 11-60657)<br><br>JUDGE SARA LIOI<br><br>**MEMORANDUM OPINION**<br>**AND ORDER** |

This matter is before the Court for de novo review of the bankruptcy court's proposed findings of fact and conclusions of law (Doc. No. 1 ["Prop. FF/CL"]) with respect to the Trustee's summary judgment motion in the adversary proceeding that relates to the Chapter 7 bankruptcy case of Trina Renee Morris ("Trina" or "Debtor"). Defendant Andy Charles Morris ("Morris") has filed objections (Doc. No. 1-5 ["Obj."]), and the Trustee has filed a response to the objections (Doc. No. 1-6 ["Resp."]).[1]

For the reasons discussed herein, the proposed findings of fact and conclusions of law are accepted in part and rejected in part. The Court adopts the bankruptcy court's ultimate conclusion of law that the Trustee is entitled to summary judgment against Morris for the Debtor's portion of equity that was fraudulently transferred. However, the Court rejects the bankruptcy court's calculations as to the value of that equity, and, therefore, recommits the matter to the bankruptcy court for further proceedings consistent with this Memorandum Opinion and Order.

---

[1] The Court must conduct its review in light of the briefs on the summary judgment motion filed in the adversary proceeding. These documents include: the motion for summary judgment (Adv. Doc. No. 36 ["MSJ"]), Morris's opposition (Adv. Doc. No. 44 ["Opp'n"]), and the Trustee's reply (Adv. Doc. No. 46 ["Reply"]).

# I. STANDARD OF REVIEW

Under 28 U.S.C. § 157(b)(2)(H), a proceeding "to determine, avoid, or recover fraudulent conveyances" is "core" to a bankruptcy case. Ordinarily, the bankruptcy court would fully adjudicate such core matters, including issuing a final order, subject to appellate review by the district court. 28 U.S.C. § 157(b)(1). But in *Stern v. Marshall*, 564 U.S. --, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011), the Supreme Court determined that some core claims actually may *not* be adjudicated by bankruptcy courts under 28 U.S.C. § 157(b) because they lack the Article III constitutional authority to do so. As pointed out by the bankruptcy judge in the instant case, according to some courts that have considered the issue, "[t]he combination of the statutory language [in §§ 157(b)(1) and (c)(1)] and the Supreme Court's decision in *Stern* leaves a 'gap' in the bankruptcy code." (Prop. FF/CL at 8, citing cases.) The Court in *Stern* did not indicate how these "gap" claims should be treated.

In *Exec. Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency Inc.)*, 702 F.3d 553 (9th Cir. 2012), one of the cases cited by the bankruptcy court as describing a statutory "gap" created by so-called *Stern* claims, the Ninth Circuit concluded that "bankruptcy courts have statutory authority to hear and enter proposed findings of fact and conclusions of law in a fraudulent conveyance proceeding asserted by a bankruptcy trustee against a noncreditor, subject to de novo review by a federal district court." *Id.* at 566. After the bankruptcy court issued its ruling in the instant case, the Supreme Court affirmed this procedure, although also finding that there is no "gap" in the statute. *Exec. Benefits Ins. Agency v. Arkison*, --U.S.--, 134 S. Ct. 2165, 2173, 189 L. Ed. 2d 83 (2014) ("The plain text of [the statute's] severability provision closes the so-called 'gap' created by *Stern* claims."). Under *Arkison*, which "assume[d] without deciding[] that the fraudulent conveyance claims . . . are *Stern* claims," *id.* at 2174, "[i]f the claim satisfies

2

the criteria of § 157(c)(1), the bankruptcy court simply treats the claim as non-core: The bankruptcy court should hear the proceeding and submit proposed findings of fact and conclusions of law to the district court for *de novo* review and entry of judgment." *Id*. at 2173.[2]

It is now for this Court to "consider[] the bankruptcy judge's proposed findings and conclusions . . . after reviewing de novo those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1). This de novo review is directed only toward "any portion of the bankruptcy judge's [determination] to which specific written objection has been made[.]" Fed. R. Bankr. P. 9033(d).[3] "The district judge may accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions." *Id.*

This de novo review also requires attention to the procedural posture of the case. The bankruptcy judge determined this matter on briefs following the Trustee's filing of a motion for summary judgment. Therefore, the de novo review must be attentive to the rules regarding summary judgment.

---

[2] It is still an open question whether, in a case involving a *Stern* claim, the parties can consent to allow the bankruptcy judge "to hear and determine and to enter appropriate orders and judgments[.]" 28 U.S.C. § 157(c)(2). The bankruptcy court in this case concluded that consent is not permitted, relying on *Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012) and *Wellness Int'l Network, Ltd. v. Sharif*, 727 F.3d 751 (7th Cir. 2013). (Prop. FF/CL at 9.) The Ninth Circuit has taken the opposite view in *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553 (9th Cir. 2012). This issue was reserved by the Court in *Arkison*. 134 S. Ct. at 2170, n. 4; however, the Court recently granted certiorari on this question. *See Wellness Int'l Network, Ltd. v. Sharif*, 134 S. Ct. 2901 (2014).

[3] This is similar to the type of review given to objections to a magistrate judge's recommended disposition of a dispositive matter. *See* Fed. R. Bankr. P. 9033 advisory committee's note (subdivision (d) adopts the de novo review provisions of Fed. R. Civ. P. 72(b)). "An 'objection' that does nothing more than state a disagreement with a magistrate's suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as that term is used in this context." *Aldrich v. Bock*, 327 F. Supp. 2d 743, 747 (E.D. Mich. 2004). *See also* Fed. R. Civ. P. 72(b)(3) ("[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to"); LR 72.3(b) (any objecting party shall file "written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.").

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An opposing party may not rely merely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In the adversary proceeding before the bankruptcy court, the Trustee moved for summary judgment and for an order "(i) avoiding the transfer of the Debtor's one-half (1/2) interest in the Real Property to [Morris] as a fraudulent transfer and (ii) entering judgment in

favor of the Trustee and against [Morris] in the amount of $132,852.34, which amount is equal to the value of the Debtor's one-half (1/2) interest in the Real Property on the date of the fraudulent transfer." (MSJ at 16.)[4]

   The facts underlying this action, as noted by the bankruptcy court, are largely undisputed. No objections have been filed relating to the following factual summary by the bankruptcy court and, therefore, these facts are accepted by this Court.

> Trina and [Morris] were married on August 29, 1992. During their marriage, the couple acquired five parcels of land (collectively, "Real Estate")[1] and had two children together. On November 23, 2009, Trina was indicted on nine felony counts of theft and forgery relating to her former employer. On April 4, 2010 Trina's former employer also brought a civil suit seeking damages of $157,000. Trina pled guilty to the nine felony counts on May 6, 2010, and was ordered to pay restitution in the amount of $61,910. Trina's employer's insurance company, on September 1, 2010, brought a civil action against Trina seeking damages in the amount of $13,420. On December 29, 2010 Trina and [Morris] divorced pursuant to a Judgment Entry of Divorce, Separation Agreement, and Shared Parenting Plan (collectively, "Divorce Agreement").

> > [1] The five parcels of land are located in Holmes County, with parcel numbers: 8003732000, 2200136007, 2100578000, 2200136009, and 2200136010.

> Under the Divorce Agreement, [Morris] will receive the following assets free and clear of Trina's claims: the Real Estate with a fair market value of $390,755, a 2004 Ford F-350 truck, a 2000 GMC [truck], a 1986 dump truck, and the complete interest in his business known as "CM Concrete." Trina, free and clear of [Morris's] claims, will receive a 2005 Ford Expedition.[2] The Divorce Agreement provides that [Morris] shall be responsible for all hospital debts, debts owed to Citifinancial, and mortgage debts with an estimated value of $125,050. Trina will be solely responsible for the debts incurred based on her fraudulent conduct of $61,910 with the potential for additional judgments of approximately $170,000, student loan payments, debts due to Capital One, debts due to The Sportsman Guide Visa, and the debt due on the 2005 Ford Expedition. The Divorce Agreement lists [Morris's] home as the primary residence of the two children, but each parent has custody of the children for an approximately equal

_____

[4] The documents in the bankruptcy case electronic file do not have a header with page identification numbers similar to those of the district court electronic file. Therefore, all citations to the bankruptcy documents are to the page numbers contained in the footers on each document. Citations to this Court's documents, including the Prop. FF/CL, are to the Page ID # contained in the electronic document headers.

amount of time. The Divorce Agreement also states that neither party will pay the other spousal support and that any right to future support is waived.

> [2] Trustee does not argue, and therefore this court will not address, whether Debtor's conveyance of her interests, if any, in the 2004 Ford F-350, 2000 GMC [truck], 1986 dump truck, and CM Concrete to [Morris] were fraudulent transfers. Trustee's complaint only asks that the transfer of the Real Estate be deemed fraudulent.

> Approximately three months after the Divorce Agreement, on March 7, 2011, Trina filed a voluntary chapter 7 bankruptcy petition. [Bankr. Case No. 11-60657.] Trustee filed a complaint on November 1, 2012 alleging that the transfer of the Real Estate in the Divorce Agreement was a fraudulent transfer. [Adv. Proc. No. 12-6133.] Trustee filed her motion for summary judgment in support of her position on June 17, 2013. [Morris] filed his memorandum in opposition to summary judgment on July 1, 2013. Trustee then filed a reply in support of her motion for summary judgment on July 8, 2013. Trustee hopes to recover Trina's interest in the Real Estate that was transferred to [Morris] for the benefit of the bankruptcy estate. [Morris] has not filed a claim against the estate in the chapter 7 case.

(Prop. FF/CL at 2-3, footnotes in original.)

The bankruptcy court allowed the Trustee to obtain an appraiser to determine the value of the Real Estate and any improvements thereon at the time of the transfer.[5] According to that appraisal, the Real Estate was valued at $390,755.00 as of the date of the transfer, with Trina's half interest being worth $132,852.34, after subtracting the mortgage debt. (*See* MSJ at 7.)

The bankruptcy judge ultimately concluded with respect to the Trustee's MSJ:

[T]he court recommends that Trustee be granted summary judgment against Defendant for Debtor's portion of equity that was fraudulently transferred pursuant to § 548(a)(l)(A) and § 548(a)(l)(B). As noted above, the value of the Depot Street property is subject to a genuine issue of material fact. Excluding the Depot Street property, the Real Estate is valued at $220,755 with a corresponding mortgage debt of $125,050, leaving $95,705 in equity. One half of the equity belongs to Debtor ($47,853). Defendant is able to deduct $11,038 for Debtor's

---

[5] This appraisal was conducted by Robert J. Cerny ("the Cerny Appraisal") on June 17, 2013, about 2½ years after the transfer of the Real Estate by way of the Divorce Agreement. There is no dispute that the value of the Real Estate as of the date of the Divorce Agreement is the relevant value.

6

half of the 10% sales expense based on the fair market value of the Real Estate
without the Depot Street property. After allowing the deduction, Debtor
fraudulently transferred $36,815 to Defendant, along with one half of the value of
the Depot Street property to be determined at a later date (less the corresponding
10% sales expense deduction). A hearing will be scheduled to determine the value
of the Depot Street property.

(Prop. FF/CL at 22.)

## III. DISCUSSION

### A.    Defendant's Objections--Generally

The bulk of the bankruptcy judge's opinion is devoted to a discussion of the

Trustee's fraudulent transfer claim under 11 U.S.C. § 548, which takes two forms: constructive

fraudulent transfer (Prop. FF/CL, Section II b) and actual fraudulent transfer (Prop. FF/CL,

Section II c).

A constructive fraudulent transfer claim is primarily concerned with whether the

debtor received "reasonably equivalent value" for what the debtor transferred to another. In this

case, the sole challenge is to the transfer of the Real Estate by way of the Divorce Agreement.

The bankruptcy judge examined five aspects of the Divorce Agreement to determine whether

there was "reasonably equivalent value" received by Debtor in exchange for the Real Estate

transferred to Morris: (1) his waiver of child support; (2) the probable cost to Morris of selling

the real estate; (3) the accuracy of the Trustee's land appraisal for purposes of valuing the

relevant real estate; (4) separate property vs. marital property; and (5) Morris's assumption of

marital debt under the Divorce Agreement. The majority of the objections raised by Morris

(Objection Nos. 1 through 5) address these issues.

An actual fraudulent transfer claim is concerned with whether the debtor had an

actual intent to hinder, defraud or delay any creditor to which the debtor was indebted. Morris

does not directly challenge the bankruptcy court's ruling as to this claim, although objection No. 8 (which challenges the bankruptcy court's failure to specifically discuss fraudulent transfers under Ohio Rev. Code § 1336.05) might be read broadly as a general challenge with respect to the actual fraudulent transfer claim.

Objection No. 6 addresses the bankruptcy judge's ruling with respect to Morris's discovery motions. Objection No. 7 is very broad and appears to be only a general challenge to the overall outcome of the bankruptcy judge's ruling.

The Court will address each objection separately.

**B.      The Individual Objections**

**Objection No. 1: The Bankruptcy Court erred by granting summary judgment to Trustee denying the separate property claims of Morris**

The bankruptcy judge identified as one of two areas of factual dispute the question of whether Morris had sufficiently proven that he had separate property that should be excluded from the marital property. The bankruptcy court noted:

> In the Divorce Agreement, Defendant did not list any separate property. Defendant first claims he has separate property in his response to Trustee's interrogatories. Defendant expands on his position in his objection to Trustee's motion for summary judgment, where he claims that he owned two tracts of land identified as 3042 Township Road and 12843 County Road 6 before his marriage to Debtor. Defendant claims he sold the 3042 Township Road property after the start of his marriage for $51,361, and the proceeds were used to purchase land located at the rear of 835 CR 520, in Glenmont, Ohio, and to make improvement[s] to land located on Depot Street in Glenmont, Ohio. Both of these pieces of land are still owned by Defendant. Defendant also claims that on December 31, 2001 he transferred the 12843 County Road 6 property to his mother in exchange for $5,000, and Defendant used the proceeds to make improvements to marital property. In order to show the receipt of money from the above sales, Defendant provides a settlement statement showing he was entitled to the receipt of $51,361 for the sale of the 3042 Township Road property, as well as a signed letter from Defendant's mother that she paid Defendant $5,000 for the 12843 County Road 6 property. Defendant's only evidence of his use of the funds are [sic] statements in his affidavit. Trustee first disagrees with Defendant's claim

8

that he received $5,000 from his mother for the 12843 County Road 6 property because Trustee argues that Defendant's deposition claims that the property was transferred in satisfaction of the property's outstanding loan, and that cash was never received. Trustee also disagrees with Defendant's claims that he used the cash receipts from the sale of his separate property in a manner that maintains separate property status.

(Prop. FF/CL at 3-4.)

The bankruptcy judge set forth the relevant law as follows:

If assets are classified as separate property, those assets are not split between spouses at divorce. Defendant argues that portions of the Real Estate were not marital property, but were instead separate property. In Ohio, unless an exception applies, marital property is "[a]ll real and personal property that currently is owned by either or both of the spouses." O.R.C. § 3105.171(A)(3)(a)(i). Therefore, during marriage, all property is presumed to be marital property. *Ruetz v. Ruetz*, [Nos. L-02-1153, L-02-1037], 2003 WL 21781604, at *6 (Ohio App. 6th [Aug. 1,] 2003). However, "any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage" is separate property. O.R.C. [§] 3105.171(A)(6)(a)(ii). The party seeking to establish that an asset is separate property bears the burden of proof. *Ruetz*, 2003 WL 21781604, at *6. If separate property is sold during the marriage, and the proceeds from the sale can be directly traced to the purchase of another asset (such as real property), the new asset is also separate property. *See id.* Before a party can obtain separate property status, evidence tracing the new asset to funds acquired from the sale of property acquired before the marriage must be present. *Id.*; *see also* O.R.C. § 3105.171(A)(7)(b) ("The commingling of separate property with other property does not destroy the identity of the separate property as separate property, *except when the separate property is not traceable*" (emphasis added)). "[T]raceability has become the focus when determining whether separate property has lost its separate character after being commingled with marital property." *Peck v. Peck*, 96 Ohio App.3d 731, 735 (Ohio App. 12th 1994).

(*Id.* at 14-15.) The court noted that Morris "present[ed] documentary evidence that he sold two pieces of separate property for $51,361 and $5,000, respectively." (*Id.* at 15.) The Trustee did not disagree that these two pieces of property were "separate property." But there was "no documentary evidence *showing that the sale price of the separate property was actually received or what account the funds were deposited into.*" (*Id.*, emphasis added.)

9

In this objection, Morris broadly interprets the bankruptcy court's conclusion as "a factual finding that there was no documentary evidence." (Obj. at 67.) He claims that the bankruptcy court "ignore[d] the closing statement and the receipt of funds as evidenced by that closing statement." (*Id.*) What Morris fails to grasp is the *nuance* in the bankruptcy court's conclusion—it was not that there was *no* evidence; it was that there was "insufficient evidence *tracing* the separate property to [Morris's] current property[,]" (Prop. FF/CL at 15, emphasis added), so as to allow the assets to retain the status of separate property.

In an affidavit attached to his opposition brief, Morris asserts that he owned two pieces of separate property prior to his marriage to Debtor. The first, a 25-acre parcel on Township Road 29, was acquired in 1992 and sold in 1997, with net proceeds totaling $51,361.34. (Morris Aff. ¶ 5; Exs. B and D.) He claims that the proceeds were used to purchase property (i.e., parcel number 22001136009—referred to as Tract IV by the Trustee) at the rear of another piece of property he owns on County Road 520 (i.e., parcel number 22001136010—referred to as Tract V), *and* to make improvements to parcel number 2200136007, an 18-acre parcel on Depot Street (referred to as Tract II). (Morris Aff. ¶ 6.) The sale of the Township Road property occurred around September 29, 1997 and the parcel on Depot Street (Tract IV) was purchased around October 2, 1997, lending some support to Morris's assertion. But there is nothing establishing the price he paid for the Depot Street property, nor is there *any* documentation to trace any part of the $51,361 in net proceeds to any improvements on Tract II. Tracing is required in order for his separate property to retain its separate nature in the context of the divorce. Some documentary or non-self-serving testimonial evidence is required to meet the burden. *See Ruetz v. Ruetz*, Nos. L-02-1153, L-02-1037, 2003 WL 21781604, at *6 (Ohio Ct. App. Aug. 1, 2003) ("in order to meet this burden [of proof by a preponderance of the evidence],

the party seeking to establish an asset as separate property must present at least some documentary evidence tracing the asset back to its non-marital status.") (citing cases). The bankruptcy judge did not ignore Morris's claim, but only properly found a lack of tracing.

The second piece of separate property Morris identifies was a 4-plus-acre lot on County Road 6, which he acquired in 1986 as a gift from his grandmother and claims to have transferred to his mother in December 2001 in exchange for $5,000. (Morris Aff. ¶ 5; Exs. C and E.) He claims he used the $5,000 "to make improvements to the real estate that is still owned[.]" (Morris Aff. ¶ 7.) As properly pointed out by the Trustee, this current assertion contradicts Morris's deposition testimony that he transferred this second piece of property to his parents in exchange for their assumption of the mortgage on the property. (*See* Reply, Ex. N, at pp. 6-7 of 10.) Under summary judgment practice, Morris cannot attempt to create a material factual dispute by contradicting his own testimony.

All that said, the bankruptcy court did not base its decision upon any conclusion that there was lack of tracing (although this Court concludes that it very well *could* have and now specifically so finds as an additional basis upon which to accept the bankruptcy court's adjudication of this issue). The bankruptcy court stated that it "need not decide whether documentary evidence is required as a matter of law in an Ohio separate property claim because [d]efendant's separate property *contradiction* bars such a claim." (Prop. FF/CL at 15-16, emphasis added.) The court applied general evidentiary principles regarding how *genuine* issues of material fact may be created to protect oneself from summary judgment. Quoting *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999), the court noted that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous statement . . . without explaining the contradiction or attempting to resolve the

11

disparity." (*Id.* at 16, alteration in original.) Applying the two-part test developed in *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908-09 (6th Cir. 2006),[6] the bankruptcy court concluded:

> In the current case, [d]efendant first specified that he had no separate property in the Divorce Agreement filed in December of 2010, but contradicted that statement in his answer to Trustee's interrogatories in March of 2013 and in his memorandum in opposition to Trustee's motion for summary judgment on July 1, 2013. Defendant's failure to list any separate Property in the Divorce Agreement, and later claiming portions of the Real Estate are separate property, is a direct conflict satisfying the first element of the *Aerel* test. Defendant has not provided any explanation for the contradiction, much less a "persuasive justification," satisfying the second element of *Aerel*. Therefore, the court rejects Defendant's separate property claim based on his direct and unexplained separate property contradiction.

(Prop. FF/CL at 16, footnote omitted.)

Morris argues that the bankruptcy court incorrectly asserted that he had not listed any separate property in the Divorce Agreement. He points to conclusory language in the Divorce Agreement to the effect that the parties own five parcels of real estate and that they "agree that their real estate is Husband's separate property free and clear of any claim" of Trina. (Obj. at 69, quoting Divorce Agreement.) He also argues that the bankruptcy judge seemed to be relying on the original asset disclosures made at the time the divorce proceedings were commenced. He claims that these documents often contain errors and inconsistencies, but that they are often corrected over time by way of discovery. That may be true; but Morris has presented no such "corrected" documentation that might establish that he, in fact, had separate property that he simply mistakenly failed to disclose in the initial filings of the divorce proceedings. Moreover, and importantly, Morris's original asset disclosure was presented in a *sworn* statement.

---

[6] The court in *Aerel* applied *Cleveland* to develop a test for determining whether to consider a contradiction to a previous statement: "(1) are the current and former statements in direct conflict; and (2) if yes, has the nonmoving party provided a 'persuasive justification' for the contradiction." (Prop. FF/CL at 16, citing *Aerel*, 448 F.3d at 908-09.)

This Court finds no error in the bankruptcy court's ruling with respect to this issue, and Morris's Objection No. 1 is overruled.

**Objection No. 2: The Bankruptcy Court erred by finding the deviation in child support down to zero did not create reasonably equivalent value to the Debtor**

Under the Shared Parenting Plan made a part of the Divorce Agreement, neither party was to pay child support to the other. (*See* MSJ, Ex. I [Doc. 36-9] at 18.) The bankruptcy judge concluded that this "waiver" did not amount to "reasonably equivalent value" for the transferred real estate. (Prop. FF/CL at 12.) The bankruptcy court noted that "a party has not received reasonably equivalent value 'when the debtor receives only an illusory promise in return' as 'there must be some legitimate and reasonable chance of return.'" (*Id.*, quoting *Frank v. Kiesel (In re Denison)*, 292 B.R. 150, 154 (E.D. Mich. 2003).) Because of Trina's financial condition,[7] the bankruptcy court ruled that it was highly unlikely that Trina could have paid child support and, therefore, any waiver of child support by Morris had no offsetting value. The bankruptcy court further concluded that Trina's transfer of her real estate interest in lieu of child support payments impermissibly harmed the bankruptcy estate's creditors.

In his objection, Morris argues that "[i]f one party is relieved of financial obligations, or the payment of marital debts that are equal to or substantially equal to the unencumbered asset, there is no fraudulent transfer claim." (Obj. at 71.) He asserts that his

---

[7] The bankruptcy court stated:

> The court concludes that reasonably equivalent value could not have been given by Debtor to Defendant in this circumstance. Debtor has recently been convicted of fraud and her former employer won a restitution judgment of over $60,000. Additionally, she faces the possibility of significantly larger civil judgments. Because of the fraud, Debtor has lost her employment, and this court believes it will be near impossible for Debtor to find a similarly paying job. For these reasons, the court finds that the waiver of child support payments is illusory and of no value to Defendant.

(Prop. FF/CL at 12-13.)

waiver of child support,[8] a debt that would ordinarily not be dischargeable in bankruptcy, was of value to the debtor and, as a result, she agreed to an "unequal, but equitable division of property order as the limited equity in the real estate was the only asset remaining that could provide a benefit to the minor children for the financial loss caused by the Debtor." (*Id.* at 72.)

The Trustee argues in response that "[c]hild support was eliminated because of the Debtor's circumstances, not because Morris opted to forego his right to receive payments." (Resp. at 87.) Further, the Trustee points out that the bankruptcy court concluded that Trina divested herself of a significant asset (the Real Estate) without receiving anything of equivalent value in return, thus harming the creditors of her estate.

Under Ohio law, courts calculate child support according to a statutory child support schedule. (*See* Ohio Rev. Code § 3119.021.) A Child Support Computation Worksheet is utilized when there is a shared parenting order. (*See* Ohio Rev. Code § 3119.022.) A court may deviate from the calculated amount of child support based on several factors. (*See* Ohio Rev. Code §§ 3119.22, 3119.23.) Here, the Divorce Agreement approved by the state court simply stated that "[t]he parties agree that a deviation from the Ohio Child Support Guideline amount is in the best interests of the children."

"[T]he standards for measuring the fairness of a property division in the domestic relations arena and reasonably equivalent value in a fraudulent transfer case are separate and distinct." *Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 707 (6th Cir. 1999). Courts "thus do not equate the Domestic Relations Court's approval of [a divorce agreement] with a determination by the court that the transfers made in connection with the parties' property division were supported by reasonably equivalent value." *Id.*

---

[8] Morris asserts that Trina's child support obligation would have totaled $60,049.23. (Obj. at 72.)

This Court concludes, as did the bankruptcy court, that there was no value attributable to Morris's "waiver" of child support. The section of the Divorce Agreement addressing child support provides nothing to suggest otherwise, offering only the most generic of reasons (i.e., "best interests of the children") for the agreement that *neither* party would pay child support.

This Court perceives no error in the findings or conclusion of the bankruptcy court with respect to reasonably equivalent value as it relates to child support. Accordingly, Objection No. 2 is overruled.

**Objection No. 3: The Bankruptcy Court erred by finding that the agreement by Morris to assume and pay most, if not all, of the marital debt should not be considered as fair consideration, reasonably equivalent value, or to support an equitable, but unequal, division of property and debt order**

Morris complains that the bankruptcy court improperly focused on only the transfer of the Real Estate without giving due consideration to *all* of the assets and liabilities of the parties when determining whether there was reasonably equivalent value enjoyed by both parties to the Divorce Agreement.

The bankruptcy judge noted:

[Morris] argues that his assumption of unsecured marital debts should be offset against the assets he received in the Divorce Agreement. In Ohio, "debt incurred [] during marriage is presumed to be marital debt." *In re Neal*, 478 B.R. at 268. However, creditors are not bound by any determination of liability made by a domestic relations court, and are instead bound only by the contractual relationship between the parties. *Id.* at 274. This means that the assumption of debt by one spouse in a divorce agreement, when that spouse is solely liable on that debt, conveys no benefit onto the other spouse. *Id.* Additionally, if both spouses are liable on the debt, the creditor can seek recovery from either party regardless of the allocation of debt in the a [sic] divorce agreement. *Id.* Therefore, the Bankruptcy Appellate Panel for the Sixth Circuit determined that the assumption of debt should not be included in a reasonable equivalence calculation, as Debtor and Defendant were "either not contractually liable for the

debt or, if [they were], [they] remained liable for the debt despite [the other parties'] [sic] assumption thereof." *Id.*

(Prop. FF/CL at 16-17.)

The only element of fraudulent conveyance that Morris challenged was the element of reasonably equivalent value. As explained by the bankruptcy court, the value of any incurred marital debt is not generally considered in that calculus. *In re Neal*, *supra*. Therefore, the bankruptcy court's conclusion is not in error and nothing in Morris's objection convinces the Court otherwise. Objection No. 3 is overruled.

**Objection No. 6**: **The Bankruptcy Court erred by denying the motion to extend time to secure a rebuttal appraisal and the motion to strike the Cerny Appraisal**

Because this objection is related to Objection No. 4, the Court will take it out of order and discuss it before No. 4.[9]

This objection amounts to a discovery dispute. Morris had sought an extension of time to conduct discovery and to file dispositive motions. He made his motion *after* discovery had closed, and after three extensions had already been granted at the Trustee's request, with the approval of opposing counsel.[10] The bankruptcy court determined that Morris had been provided sufficient time to conduct discovery; that he had scheduled the Trustee's deposition, voluntarily canceled it and, despite an extension, never rescheduled; and that he chose not to obtain his own appraisal prior to seeing the Trustee's appraisal, allegedly in an effort to save money but just as

---

[9] Morris incorporates by reference the arguments raised in both Objection No. 4 and Objection No. 5. (See Obj. at 78.) The Court does not perceive any connection to No. 5.

[10] As noted in the Trustee's opposition to Morris's motion for extension (Bankr. Doc. No. 35), the first extension was rendered necessary by Morris's outstanding discovery responses and unavailability for a then-noticed deposition. The second extension was sought for the express purpose of allowing Morris time to schedule the Trustee's deposition, which he never did despite being offered several dates when the Trustee would be available. The third extension was granted to allow Morris time to produce certain records and because the Trustee's appraisal was not yet completed.

likely as an attempt to gain some tactical advantage by seeing his opponent's appraisal before obtaining his own. (Prop. FF/CL at 20.)

The bankruptcy court's decision to deny a fourth motion for extension of time to conduct discovery related to an issue that was germane from the outset is reviewed for abuse of discretion. *In re Valley-Vulcan Mold Co.* 5 F. App'x 396, 400-01 (6th Cir. 2001) (concluding that "the bankruptcy court did not abuse [its] discretion by denying [plaintiff's] motions to extend discovery and postpone trial where the [plaintiff's] behavior appeared dilatory and tactical."). This Court finds no abuse of discretion.

This objection also addresses the bankruptcy court's refusal to strike the Trustee's appraisal simply because it was delivered one day after the close of discovery. The bankruptcy court found no evidence that the Trustee acted in bad faith or that Morris was prejudiced in any way. Morris has supplied nothing in his objection to contradict the bankruptcy court's conclusion. This Court finds no abuse of discretion.

Objection No. 6 is overruled.

**<u>Objection No. 4</u>: The Bankruptcy Court erred when it issued its finding, for summary judgment purposes, that the Depot Street property value is either $170,000, $125,000 or $100,000**

The bankruptcy court noted in its factual recitation that the value of only one of the five parcels of real estate owned by Morris and Trina was disputed--the Depot Street property. Because of this factual dispute, the bankruptcy court ultimately concluded that a fact-finder would be needed to make the final determination as to value. (*See* Prop. FF/CL at 22.) Examining the only available evidence of value, the bankruptcy court stated:

> When viewing the Cerny Appraisal's valuation of the Depot Street property in the light most favorable to Defendant, a genuine issue of material fact exists as to the Depot Street property's value as of January 7, 2011. Based on the

> above, the valuation of the Depot Street property is either [sic] $170,000 (Trustee's interpretation of the Cerny Appraisal), $125,000 (Defendant's valuation after subtracting the "contributory value"), or $100,000 (the Cerny Appraisal notes). After accounting for the differences in the Depot Street property valuations, the equity in the Real Estate could be $265,705, $220,705 or $195,705, respectively.

(*Id.* at 14.)

Morris argues in his objection that "it constitutes error for the [b]ankruptcy [c]ourt to limit the evidence that Morris is entitled to submit to support the correct value of the property and/or the contributory value provided by Morris through his expenditures and improvements since the time of the Divorce Decree." (Obj. at 76.) He asserts that, "the value of this property is unknown and must be determined at the time of trial." (*Id.* at 77.)

In opposition, the Trustee asserts that "there is absolutely no basis for Morris'[s] objection that the [b]ankruptcy [c]ourt's finding that one of the three (3) stated values is, and will be, correct." (Resp. at 91.) The Trustee argues that, until now, Morris has not challenged the $45,000 contributory value figure, and has, in fact, tacitly accepted it by arguing that the Trustee "ignored the $45,000 discount" and "refuses to even acknowledge the $45,000 discount imposed by her own appraiser[.]" (*See* Bankr. Doc. No. 44 at 16, 17.)

This Court is of the view that, since there is a factual dispute as to the value of the Depot Street property, it is for a fact-finder to determine from all the evidence that will be available what that value was at the time of the Divorce Agreement. The fact that Morris accepted as true for purposes of a summary judgment argument a discount figure of $45,000, does not irrevocably tie him to that figure, or any other, at the time of trial. He will be free, as will be the Trustee, to establish the value in the usual way – by submission of evidence to the

fact-finder. Presumably, the Trustee will rely on the Cerny Appraisal and it will be up to Morris to appropriately rebut that evidence.

That said, this objection must be weighed in light of the discussion of Objection No. 6. Morris apparently made a tactical decision not to depose the Trustee *and* not to obtain his own appraisal of the relevant Real Estate. As a result, he has limited his own ability to submit evidence at the trial. This Court's ruling with respect to this objection does not mean Morris will be permitted to reopen discovery, including expert discovery, to produce new evidence (unless the bankruptcy judge, in his discretion, were to permit that).

Only to the extent set forth herein, Objection No. 4 is sustained.

**Objection No. 5: The Bankruptcy Court erred by limiting the sale expenses to ten percent (10%) in determining the equity in the real estate**

Defendant argued in opposition to the Trustee's motion for summary judgment that, if he were forced to return Trina's half interest in the real property, he could only do so by selling the property. Under Ohio law, if a sale of property is required to effectuate an equitable distribution of marital property, the court is permitted to consider the cost of sale when determining the value of the property. *See* Ohio Rev. Code § 3105.171(F)(7). In his opposition to the motion for summary judgment, Morris suggested that the costs could "average between 10% to 15% of the sale proceeds." (Bankr. Doc. No. 44 at 12.) For purposes of the motion, he used 10% of the Cerny Appraisal value, which would be $39,000.

The bankruptcy court stated: "[Morris] claimed a 10% reduction and Trustee does not dispute this point." (Prop. FF/CL at 13.) It then concluded: "The court finds that [Morris] is entitled to deduct one-half of the cost of sale, set at 10% of the fair market value of the real estate, from what he received under the Divorce Agreement." (*Id.*)

Morris objects to this finding of a 10% reduction, arguing that 10% is the figure "normally used when the sale takes place as a result of an arms-length negotiation and/or a normal real estate closing." (Obj. at 77.) "When there is an auction sale, which is more likely in a bankruptcy situation, the sale expenses are much higher and usually reach 14% to 15%." (*Id.*) He argues that it is error to lock in the sale expense at 10% when it remains an unknown amount. At the very least, Morris argues that this is a question of fact, requiring the testimony of witnesses.

In opposition, the Trustee argues that "Morris'[s] attack on the reasonableness of the [b]ankruptcy [c]ourt's selection of 10% contravenes his acknowledgment of the [b]ankruptcy [c]ourt's familiarity with sale costs in these types of sales and his own suggestion that 10% is within the bounds of reasonableness." (Resp. at 93.) The Trustee further asserts that "(i) the [b]ankruptcy [c]ourt's application of ten percent (10%) sale costs [should] be adopted for the purpose of fixing the judgment amount and (ii) that this Court can clarify that *actual* costs of sale, which may be subject to [b]ankruptcy [c]ourt approval prior to sale, must be shared equally by the parties." (*Id.* at 94.)

The Court agrees that Morris should be allowed to deduct a portion of the sale costs, if a sale occurs. If no sale occurs, such costs will obviously not be a factor in determining value. The Court further concludes that determining the sale costs now simply "for the purpose of fixing the judgment amount" is premature, *see, e.g.*, *Sweet v. Sweet*, Nos. 2007-A-0003, 2008-A-0003, 2009 WL 1110875, at * 4 (Ohio Ct. App. Apr. 24, 2009) ("consideration of the costs of sale is only appropriate so long as those consequences are not speculative") (internal quotes and citation omitted), and it was error for the bankruptcy court to make this fact-dependent determination at the summary judgment stage, notwithstanding the bankruptcy judge's acknowledged familiarity with the issue. The Trustee's suggestion that the costs of any sale

20

should be shared equally by the parties is probably a good one, but one that need not be adopted at this juncture. All that need be said is that, if the real property must be sold to refund its value to the bankruptcy estate, Morris will be allowed to deduct the cost of the sale in whatever amount is determined to be equitable. At this point in the proceedings, it is not a foregone conclusion that the sale costs will be 10% of the sale or of the fair market value.

As set forth herein, Objection No. 5 is sustained. As a result, the bankruptcy judge's overall calculation of the Debtor's equity must be rejected at this juncture because it incorporated the 10% value for sale costs.

### Objection No. 7: The Bankruptcy Court erred by granting summary judgment in favor of Trustee on Trustee's fraudulent conveyance claims

This objection does not meet the specificity requirement of Rule 9033(d), a fact that Morris himself seems to recognize since he "incorporates by reference the applicable law and argument set forth in Objection Nos. 1 through 6 herein." (Obj. at 78.) It is merely a catch-all statement of disagreement with the bankruptcy court's ruling. This Court is not required to address such non-specific "objections."

Objection No. 7 is overruled.

### Objection No. 8: The Bankruptcy Court erred by not considering and addressing the fraudulent transfer provisions specified in R.C. § 1336.05

At first blush, this also appears to be a generalized objection to the overall ruling of the bankruptcy court. Morris "incorporates by reference the applicable law and argument set forth in Objection Nos. 1 through 7." (Obj. at 80.) As such, this Court is not required to address it.

Although the objection specifically cites failure to address a fraudulent transfer claim under an Ohio statute, there are no arguments that would explain how the bankruptcy court erred. Comparison of 11 U.S.C. § 548 and Ohio Rev. Code § 1336.05 reveals that they are virtually identical with respect to the elements that need to be proven.[11] Therefore, the discussion of the elements under federal law is sufficient to address the same elements under Ohio law.

In an abundance of caution, however, the Court notes Morris's assertion within this objection that "for summary judgment purposes a question of fact exists as to whether the transfers that resulted from the Divorce Decree were made with the intent to hinder, delay or defraud any person or entity that was, or became, a creditor of the Debtor." (*Id.* at 80.) If this is an objection at all, and if it is specific enough, it can only be read as a challenge to the bankruptcy court's determination as to the *actual* fraudulent transfer claim under federal law.[12]

The bankruptcy court stated:

> Fraudulent intent is rarely proven by direct evidence. *In re Gabor*, 280 B.R. at 157. In order to combat this problem, courts have developed "badges of fraud," which, if established, result in fraudulent intent being presumed, shifting the burden to the Debtor to show that the transfer was not fraudulent. *Id.* A badge of fraud arises in circumstances "so frequently attending [a] fraudulent transfer[] that an inference of fraud arises." *United States v. Isaac*, 968 F .2d 1216, 1992 WL 159795, at *4 (6th Cir. 1992) (unpublished). Under Ohio law, badges of fraud are:
> > (1) Whether the transfer or obligation was to an insider;
> > (2) Whether the debtor retained possession or control of the property transferred after the transfer;
> > (3) Whether the transfer or obligation was disclosed or concealed;
> > (4) Whether before the transfer was made or the obligation incurred, the debtor had been sued or threatened with suit;

---

[11] Under 11 U.S.C. § 548(a)(1)(A), a trustee may avoid a transfer if it is proven that the transfer was made "with actual intent to hinder, delay, or defraud" a creditor. There is no comparable provision in the Ohio statute.

Section 548(a)(1)(B) permits avoidance if the debtor "received less than a reasonably equivalent value in exchange for such transfer[.]" Similarly, Ohio Rev. Code § 1336.05(A) requires "a reasonably equivalent value in exchange for the transfer[.]"

[12] As already noted, the cited Ohio statute does not appear to encompass any claim of *actual* fraudulent transfer.

(5) Whether the transfer was of substantially all of the assets of the
debtor;
(6) Whether the debtor absconded;
(7) Whether the debtor removed or concealed assets;
(8) Whether the value of the consideration received by the debtor
was reasonably equivalent to the value of the asset transferred or
the obligation incurred;
(9) Whether the debtor was insolvent or became insolvent shortly
after the transfer was made or the obligation was incurred;
(10) Whether the transfer occurred shortly before or shortly after a
substantial debt was incurred; and
(11) Whether the debtor transferred the essential assets of the
business to a lienholder who transferred the assets to an insider of
the debtor.

O.R.C. § 1336.04(B). Bankruptcy courts in the Sixth Circuit have recognized
many of the above badges of fraud. *See e.g.*, *In re Gabor*, 280 B.R. at 156. While
one badge of fraud may only raise the court's suspicion of a debtor, "the
confluence of several badges can be conclusive evidence of fraudulent intent,
absent significantly clear evidence of the debtor's legitimate supervening
purpose." *Id*. at 157.

In some cases, courts have shifted the burden of proof from the plaintiff to
the defendant only after illustrating a few badges of fraud *and* a showing that the
transfer was without adequate consideration. *See Green v. Stevenson (ln re
Stevenson)*, 69 B.R. 49 (Bankr. E.D. Mo. 1986) (cited in *Schilling v. Heavrin (In
re Triple S Restaurants. Inc.)*, 422 F.3d 405, 414-15 (6th Cir. 2005)). However, in
2005 the Sixth Circuit decided that if a sufficient number of badges of fraud are
present, "the burden of proof may shift even where consideration has not been
shown to be inadequate." *In re Triple S Restaurants. Inc.*, 422 F.3d at 416
(holding that the burden of proof in a fraudulent conveyance action shifted to the
debtor when the trustee was able to show that the transfer benefited the debtor's
close family members and a corporate insider, even without a showing that the
transfer lacked reasonable equivalence). Once the burden of proof has transferred
to the debtor, if he cannot offer a legitimate reason for the transfer, actual fraud
will be shown. *See In re Gabor*, 280 B.R. 158; *Slone v. Lassiter (ln re Grove-
Merritt)*, 406 B.R. 778, 794 (Bankr. S.D. Ohio 2009).

In the current case, Trustee has shown a sufficient number of badges of
fraud to create a presumption of actual fraud. The badges of fraud present in this
case are:

(1) The transfer was made in the face of litigation as well as the
threat of additional future litigation.

(2) Debtor was insolvent at the date of the transfer or the transfer made Debtor insolvent.

(3) The transfer was made without receiving reasonably equivalent value.

(4) The transfer was of substantially all of Debtor's assets. According to Schedule B of Debtor's bankruptcy petition, Debtor's total personal property as of the date of the petition was $6,475. As Debtor's one-half interest in the equity in the Real Estate was $132,853,[8] Debtor transferred approximately 95% of her property in the Divorce Agreement.

> [8] The $132,853 valuation may change based on the court's interpretation of the Cerny Appraisal. Even viewing the Cerny Appraisal in the light most favorable to Defendant, Debtor still transferred substantially all of her assets.

(5) Debtor obtained a waiver of future child support obligations to the detriment of current creditors. Debtor's actions amount to accelerating an unmatured, future obligation and allowing her to prepay it. Assets that were immediately available, equity in the real estate, were traded for a future obligation that has not yet come due. This is little different than allowing a debtor to prepay ten years of rent or any other future expense saving tactic at the expense of current creditors holding liquidated, matured debts. While this action has not previously been listed as a badge of fraud, under the particular facts of this case, the court finds the transaction increases the overall likelihood of actual fraudulent intent.

This court finds that a sufficient number of badges of fraud are present to create a presumption of actual fraud. In a similar case, this court found a presumption of actual fraud when there was (1) actual litigation and threatened litigation against the debtor; (2) the debtor made the transfer while insolvent; (3) there was not fair consideration for the transfer; and (4) the transfer was made to a person with a special relationship to the debtor. *In re Gabor*, 280 B.R. at 158. The similarity between the current case and *In re Gabor* strengthen this court's belief that a presumption of actual fraud is appropriate.

(Prop. FF/CL at 17-19, footnote in original.)

Morris offers nothing other than a conclusory assertion that "questions of fact exist as to whether the transfers made as a result of the entire Divorce Decree were made without fair consideration." (Obj. at 80.) However, "fair consideration" is not the issue in an actual

fraudulent transfer claim. Morris has presented no record evidence to refute the "badges of fraud" identified by the bankruptcy judge.

Objection No. 8 is overruled.

## IV. CONCLUSION

Having conducted its *de novo* review of Morris's objections to the Memorandum of Opinion, Proposed Findings of Fact and Conclusions of Law, the objections are sustained in part and overruled in part.

The Court adopts the bankruptcy court's ultimate conclusion of law that the Trustee is entitled to summary judgment against Morris for the Debtor's portion of equity that was fraudulently transferred. The Court rejects the bankruptcy court's calculations as to the value of the equity. This matter is recommitted to the bankruptcy court for further proceedings consistent with this Memorandum Opinion and Order.

**IT IS SO ORDERED**.

Dated: February 26, 2015

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**